RECEIVED

NOV 2 9 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **[UNDER SEAL]** | ) ) ) | **Civil Action No. 07-1117 [SEALED]** |
| Plaintiff, | ) ) | **(Judge Tucker L. Melancon)** |
| -v- | ) ) ) | **FIRST AMENDED COMPLAINT** |
| **[UNDER SEAL]** | ) ) | |
| Defendants. | ) | |

# QUI TAM ACTION

# FILED IN CAMERA AND UNDER SEAL

RECEIVED

NOV 2 9 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **JUDY MASTER,** ) ) | **Civil Action No. 07-1117(SEALED)** |
| ) | **(Judge Tucker L. Melancon)** |
| **Relator/Qui Tam Plaintiff,** ) ) | |
| ) | **FIRST AMENDED COMPLAINT AND** |
| -v- ) | **JURY DEMAND** |
| ) | |
| **LHC GROUP, INC.,** ) | **TO BE FILED UNDER SEAL** |
| **420 West Pinhook Rd.** ) | **DO NOT SERVE** |
| **Suite A** ) | |
| **Lafayette, LA 70503** ) | |
| ) | |
| **and** ) | |
| ) | |
| **ABLE HOME HEALTH, INC.,** ) | |
| **(Alabama)** ) | |
| ) | |
| **and** ) | |
| ) | |
| **ALABAMA HEALTH CARE GROUP,** ) | |
| **LLC,** ) | |
| **(Alabama)** ) | |
| ) | |
| **and** ) | |
| ) | |
| **CLAY COUNTY HOSPITAL** ) | |
| **HOMECARE, LLC,** ) | |
| **(Alabama)** ) | |
| ) | |
| **and** ) | |
| ) | |
| **D. W. MCMILLAN MEMORIAL** ) | |
| **HOSPITAL,** ) | |
| **(Alabama)** ) | |

1

and )
)
**MIZELL MEMORIAL HOSPITAL** )
**HOMECARE, LLC,** )
**(Alabama)** )
)
and )
)
**THOMAS HOSPITAL,** )
**(Alabama)** )
)
and )
)
**THOMAS HOME HEALTH AGENCY,** )
**(Alabama)** )
)
and )
)
**AHCG MANAGEMENT, LLC,** )
**(Arkansas)** )
)
and )
)
**ARKANSAS HEALTH CARE GROUP,** )
**LLC,** )
**(Arkansas)** )
)
and )
)
**ARKANSAS HOMECARE OF HOT** )
**SPRINGS, LLC,** )
**(Arkansas)** )
)
and )
)
**DALLAS COUNTY MEDICAL CENTER** )
**HOMECARE, LLC,** )
**(Arkansas)** )
)
and )
)
**EUREKA SPRINGS HOSPITAL** )
**HOMECARE, LLC,** )
**(ARKANSAS)** )
)
and )

2

**EUREKA SPRINGS HOSPITAL**
**HOSPICE, LLC,**
**(Arkansas)**

**and**

**MENA MEDICAL CENTER HOME**
**HEALTH, LLC,**
**(Arkansas)**

**and**

**MENA MEDICAL CENTER HOSPICE,**
**LLC,**
**(ARKANSAS)**

**and**

**SOUTHWEST ARKANSAS HOMECARE,**
**LLC,**
**(Arkansas)**

**and**

**HOWARD MEMORIAL HOSPITAL,**
**(Arkansas)**

**and**

**LHC HEALTH CARE GROUP OF**
**FLORIDA, LLC,**
**(Florida)**

**and**

**LIFELINE HOME HEALTH CARE OF**
**PORT CHARLOTTE, LLC,**
**(Florida)**

**and**

**LIFELINE HOME HEALTH CARE OF**
**LAKELAND, LLC,**
**(Florida)**

**and**

3

LIFELINE HOME HEALTH CARE OF )
LADY LAKE, LLC,                )
(Florida)                      )
                               )
and                            )
                               )
LIFELINE HOME HEALTH CARE OF   )
MARATHON, LLC,                 )
(Florida)                      )
                               )
and                            )
                               )
MUNROE REGIONAL HOMECARE,      )
LLC,                           )
(Florida)                      )
                               )
and                            )
                               )
FLOYD HOMECARE, LLC,           )
(Georgia)                      )
                               )
and                            )
                               )
GEORGIA HEALTH CARE GROUP,     )
LLC,                           )
(Georgia)                      )
                               )
and                            )
                               )
GEORGIA HOMECARE OF HARRIS,    )
LLC,                           )
(Georgia)                      )
                               )
and                            )
                               )
LHC HOMECARE, LLC,             )
(Kentucky)                     )
                               )
and                            )
                               )
LHC HOMECARE-LIFELINE, LLC,    )
(Kentucky)                     )
                               )
and                            )
                               )
                               )

**LIFELINE HOME HEALTH CARE OF BOWLING GREEN, LLC,**
(Kentucky)

and

**LIFELINE HOME HEALTH CARE OF SOMERSET, LLC,**
(Kentucky)

and

**LIFELINE HOME HEALTH CARE OF RUSSELLVILLE, LLC,**
(Kentucky)

and

**LIFELINE HOME HEALTH CARE OF LEXINGTON, LLC,**
(Kentucky)

and

**LIFELINE HOME HEALTH CARE OF HOPKINSVILLE, LLC,**
(Kentucky)

and

**LIFELINE PRIVATE DUTY SERVICES OF KENTUCKY, LLC,**
(Kentucky)

and

**KENTUCKY HEALTH CARE GROUP, LLC,**
(Kentucky)

and

**ACADIAN HOMECARE, LLC,**
(Louisiana)

and

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ACADIAN HOME HEALTH CARE** )
**SERVICES, LLC,** )
**(Louisiana)** )
)
**and** )
)
**ACADIAN PREMIERE REGIONAL** )
**NURSING, LLC,** )
**(Louisiana)** )
)
**and** )
)
**BATON ROUGE HOMECARE, LLC,** )
**(Louisiana)** )
**and** )
)
**BIENVILLE MEDICAL CENTER,** )
**(Louisiana)** )
)
**and** )
)
**DIABETES SELF-MANAGEMENT** )
**CENTER, INC.,** )
**(Louisiana)** )
)
**and** )
)
**HOME NURSING CARE, LLC,** )
**(Louisiana)** )
)
**and** )
)
**HOOD HOME HEALTH SERVICE, LLC,** )
**(Louisiana)** )
)
**and** )
)
**LHC GROUP PHARMACEUTICAL** )
**SERVICES, LLC,** )
**(Louisiana)** )
)
**and** )
)
**LHCG-III, LLC,** )
**(Louisiana)** )
)

**and**                                                       )
                                                             )
**LHCG-IV, LLC,**                                            )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LHCG-V, LLC,**                                             )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LHCG-VI, LLC,**                                            )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LHCG-VII, LLC,**                                           )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LHCG-VIII, LLC,**                                          )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LHCG-IX, LLC,**                                            )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LHCG-XI, LLC,**                                            )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LOUISIANA HEALTH CARE GROUP,**                             )
**LLC,**                                                     )
**(Louisiana)**                                              )
                                                             )
**and**                                                      )
                                                             )
**LOUISIANA HOMECARE OF DELHI,**                             )
**LLC,**                                                     )
**(Louisiana)**                                              )

and                                              )
                                                 )
**LOUISIANA HOMECARE OF**                        )
**GREATER NEW ORLEANS, LLC,**                    )
**(Louisiana)**                                  )
                                                 )
and                                              )
                                                 )
**LOUISIANA HOMECARE OF**                        )
**HAMMOND, LLC,**                                )
**(Louisiana)**                                  )
                                                 )
and                                              )
                                                 )
**LOUISIANA HOMECARE OF MINDEN,** )
**LLC,**                                         )
**(Louisiana)**                                  )
                                                 )
and                                              )
                                                 )
**LOUISIANA HOMECARE OF MISS-**                  )
**LOU, LLC,**                                    )
**(Louisiana)**                                  )
                                                 )
and                                              )
                                                 )
**LOUISIANA HOMECARE OF NORTH**                  )
**LOUISIANA, LLC,**                              )
**(Louisiana)**                                  )
                                                 )
and                                              )
                                                 )
**LOUISIANA HOMECARE OF**                        )
**NORTHWEST LOUISIANA, LLC,**                    )
**(Louisiana)**                                  )
                                                 )
and                                              )
                                                 )
**LOUISIANA HOMECARE OF SLIDELL,** )
**LLC,**                                         )
**(Louisiana)**                                  )
                                                 )
and                                              )
                                                 )
                                                 )
                                                 )

**LOUISIANA HOSPICE AND**
**PALLIATIVE CARE, LLC,**
**(Louisiana)**

**and**

**LOUISIANA PHYSICAL THERAPY,**
**LLC,**
**(Louisiana)**

**and**

**OAK SHADOWS OF JENNINGS, LLC,**
**(Louisiana)**

**and**

**PATIENT'S CHOICE HOSPICE AND**
**PALLIATIVE CARE OF LOUISIANA,**
**LLC,**
**(Louisiana)**

**and**

**RICHARDSON MEDICAL CENTER**
**HOMECARE, LLC,**
**(Louisiana)**

**and**

**ST. FRANCIS HOMECARE, LLC,**
**(Louisiana)**

**and**

**ST. JAMES HOMECARE, LLC,**
**(Louisiana)**

**and**

**ST. LANDRY EXTENDED CARE**
**HOSPITAL, LLC,**
**(Louisiana)**

**and**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

THIBODEAUX, ALBRO AND TOUCHET )
THERAPY GROUP, INC., )
(Louisiana) )
)
and )
)
TRI-PARISH COMMUNITY )
HOMECARE, LLC, )
(Louisiana) )
)
and )
)
EXTENDED CARE HOSPITAL OF )
LAFAYETTE, )
(Louisiana) )
)
and )
)
TEXAS HEALTH CARE GROUP )
HOLDINGS, LLC, )
(Louisiana) )
)
and )
)
ABLE HOME HEALTH, INC., )
(Mississippi) )
)
and )
)
LEAF RIVER HOME HEALTH CARE, )
LLC, )
(Mississippi) )
)
and )
)
MISSISSIPPI HEALTH CARE GROUP, )
LLC, )
(Mississippi) )
)
and )
)
MISSISSIPPI HOMECARE, LLC, )
(Mississippi) )
)
and )
)

**MISSISSIPPI HOMECARE OF
JACKSON, LLC,**
**(Mississippi)**                          )
                                           )
                                           )
                                           )
**and**                                    )
                                           )
**PICAYUNE HOMECARE, LLC,**                )
**(Mississippi)**                          )
                                           )
                                           )
**and**                                    )
                                           )
**NORTH CAROLINA HEALTH CARE**             )
**GROUP, LLC,**                            )
**(North Carolina)**                       )
                                           )
**and**                                    )
                                           )
**SOUTH CAROLINA HEALTH CARE**             )
**GROUP, LLC,**                            )
**(South Carolina)**                       )
                                           )
**and**                                    )
                                           )
**LIFELINE HOME HEALTH CARE OF**           )
**UNION CITY, LLC,**                       )
**(Tennessee)**                            )
                                           )
**and**                                    )
                                           )
**TENNESSEE HEALTH CARE GROUP,**           )
**LLC,**                                   )
**(Tennessee)**                            )
                                           )
**and**                                    )
                                           )
**EXTENDED CARE OF WEST**                  )
**TENNESSEE,**                             )
**(Tennessee)**                            )
                                           )
**and**                                    )
                                           )
**UNIVERSITY OF TENNESSEE**                )
**MEDICAL CENTER,**                        )
**(Tennessee)**                            )
                                           )
**and**                                    )

**GSHS HOME HEALTH, LP,**
**(Texas)**                                        )
                                                   )
                                                   )
**and**                                            )
                                                   )
**MARSHALL HOMECARE, LP,**                          )
**(Texas)**                                        )
                                                   )
                                                   )
**and**                                            )
                                                   )
**RED RIVER HOMECARE, LLC,**                        )
**(Texas)**                                        )
                                                   )
                                                   )
**and**                                            )
                                                   )
**TEXAS HEALTH CARE GROUP, LLC,**                   )
**(Texas)**                                        )
                                                   )
                                                   )
**and**                                            )
                                                   )
**TEXAS HEALTH CARE GROUP OF**                      )
**LONGVIEW, LLC,**                                 )
**(Texas)**                                        )
                                                   )
                                                   )
**and**                                            )
                                                   )
**TEXAS HEALTH CARE GROUP OF**                      )
**TEXARKANA, LLC,**                                )
**(Texas)**                                        )
                                                   )
                                                   )
**and**                                            )
                                                   )
**TEXAS HEALTH CARE GROUP OF**                      )
**THE GOLDEN TRIANGLE, LLC,**                       )
**(Texas)**                                        )
                                                   )
**and**
                                                   )
**HOMECARE PLUS, INC.,**                            )
**(West Virginia)**                                )
                                                   )
                                                   )
**and**                                            )
                                                   )
**WEST VIRGINIA HEALTH CARE**                       )
**GROUP, LLC,**                                    )
**(West Virginia)**                                )

12

and                                                  )
                                                     )
**PRINCETON COMMUNITY**                              )
**HOMECARE, LLC,**                                   )
**(West Virginia)**                                  )
                                                     )
and                                                  )
                                                     )
**ROANE GENERAL HOME HEALTH,**                       )
**LLC,**                                             )
**(West Virginia)**                                  )
                                                     )
and                                                  )
                                                     )
**ROANE GENERAL HOSPITAL,**                          )
**(West Virginia)**                                  )
                                                     )
and                                                  )
                                                     )
**WETZEL COUNTY HOMECARE, LLC,**  )
**(West Virginia)**                                  )
                                                     )
and                                                  )
                                                     )
**JOHN DOES 1-100,**                                 )
                                                     )
                                                     )
                     **Defendants.**                 )

This is an action by *qui tam* Relator Judy Master ("Relator"), through the undersigned

counsel, made on behalf of herself and the United States of America ("United States") to recover

damages and penalties arising from Defendants LHC Group, Inc., Able Home Health, Inc.,

Alabama Health Care Group, LLC, Clay County Hospital HomeCare, LLC, D. W. McMillan

Memorial Hospital, Mizell Memorial Hospital HomeCare, LLC, Thomas Hospital, Thomas

Home Health Agency, AHCG Management, LLC, Arkansas Health Care Group, LLC, Arkansas

HomeCare of Hot Springs, LLC, Dallas County Medical Center HomeCare, LLC, Eureka

Springs Hospital HomeCare, LLC, Eureka Springs Hospital Hospice, LLC, Mena Medical

Center Home Health, LLC, Mena Medical Center Hospice, LLC, Southwest Arkansas

13

HomeCare, LLC, Howard Memorial Hospital, LHC Health Care Group of Florida, LLC, Lifeline Home Health Care of Port Charlotte, LLC, Lifeline Home Health Care of Lakeland, LLC, Lifeline Home Health Care of Lady Lake, LLC, Lifeline Home Health Care of Marathon, LLC, Munroe Regional HomeCare, LLC, Floyd HomeCare, LLC, Georgia Health Care Group, LLC, Georgia HomeCare of Harris, LLC, LHC HomeCare, LLC, LHC HomeCare-Lifeline, LLC, Lifeline Home Health Care of Bowling Green, LLC, Lifeline Home Health Care of Somerset, LLC, Lifeline Home Health Care of Russellville, LLC, Lifeline Home Health Care of Lexington, LLC, Lifeline Home Health Care of Hopkinsville, LLC, Lifeline Private Duty Services of Kentucky, LLC, Kentucky Health Care Group, LLC, Acadian HomeCare, LLC, Acadian Home Health Care Services, LLC, Acadian Premiere Regional Nursing, LLC, Baton Rouge HomeCare, LLC, Bienville Medical Center, Diabetes Self-Management Center, Inc., Home Nursing Care, LLC, Hood Home Health Service, LLC, LHC Group Pharmaceutical Services, LLC, LHCG-III, LLC, LHCG-IV, LLC, LHCG-V, LLC, LHCG-VI, LLC, LHCG-VII, LLC, LHCG-VIII, LLC, LHCG-IX, LLC, LHCG-XI, LLC, Louisiana Health Care Group, LLC, Louisiana HomeCare of Delhi, LLC, Louisiana HomeCare of Greater New Orleans, LLC, Louisiana HomeCare of Hammond, LLC, Louisiana HomeCare of Minden, LLC, Louisiana HomeCare of Miss-Lou, LLC, Louisiana HomeCare of North Louisiana, LLC, Louisiana HomeCare of Northwest Louisiana, LLC, Louisiana HomeCare of Slidell, LLC, Louisiana Hospice and Palliative Care, LLC, Louisiana Physical Therapy, LLC, Oak Shadows of Jennings, LLC, Patient's Choice Hospice and Palliative Care of Louisiana, LLC, Richardson Medical Center HomeCare, LLC, St. Francis HomeCare, LLC, St. James HomeCare, LLC, St. Landry Extended Care Hospital, LLC, Thibodeaux, Albro and Touchet Therapy Group, Inc., Tri-Parish Community HomeCare, LLC, Extended Care Hospital of Lafayette, Texas Health Care Group Holdings, LLC, Able Home

14

Health, Inc., Leaf River Home Health Care, LLC, Mississippi Health Care Group, LLC, Mississippi HomeCare, LLC, Mississippi HomeCare of Jackson, LLC, Picayune HomeCare, LLC, North Carolina Health Care Group, LLC, South Carolina Health Care Group, LLC, Lifeline Home Health Care of Union City, LLC, Tennessee Health Care Group, LLC, Extended Care of West Tennessee, University of Tennessee Medical Center, GSHS Home Health, LP, Marshall HomeCare, LP, Red River HomeCare, LLC, Texas Health Care Group, LLC, Texas Health Care Group of Longview, LLC, Texas Health Care Group of Texarkana, LLC, Texas Health Care Group of The Golden Triangle, LLC, HomeCare Plus, Inc., West Virginia Health Care Group, LLC, Princeton Community HomeCare, LLC, Roane General Home Health, LLC, Roane General Hospital, Wetzel County HomeCare, LLC, and John Does 1-100 (collectively "Defendants") using, making or presenting false statements and claims to the government in violation of the False Claims Act, 31 U.S.C. § 3729 *et. seq.* The Defendants wrongfully obtained substantial funds from government healthcare programs, including Medicare and TRICARE/CHAMPUS, through false claims and false statements made in connection with each of its many home health care service facilities and programs being provided across the country during the past ten years. Defendants are one of the largest recipients of Medicare in the United States and have made over $460 million in Medicare-derived revenue over the past 3 ¼ years, already receiving over $56 million in Medicare reimbursements in the first quarter of 2007 alone.

Under the terms of the False Claims Act, this First Amended Complaint is to be filed in camera and under seal and is to remain under seal for a period of at least sixty days and shall not be served on the Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within the sixty day time frame, or within any extensions of that initial sixty day period granted by the Court for good cause shown, after it receives both the

15

Original Complaint and the Material Evidence submitted to it.

For her cause of action, the Relator alleges as follows:

## NATURE OF ACTION

1. This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

2. Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery. 31 U.S.C.§ 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## JURISDICTION

3. This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

4. The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants transacts and has transacted business in this District.

## VENUE

5. Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because at least one of the Defendants reside and/or transact business in this District.

## PARTIES

6. The Relator brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS") and its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration

("HCFA")), TRICARE/CHAMPUS, and all other federal healthcare programs.

7. The Relator also brings this action on behalf of herself, as permitted under the False Claims Act. Relator Judy Master is a citizen of the United States and a resident of the State of Texas. Judy Master is licensed as a registered nurse (RN) in the State of Texas and was employed as an RN Compliance Auditor for M Jan Spears & Assoc Inc. ("MJS") from March 26, 2007 to June 11, 2007.

8. MJS is a health care consulting firm licensed to do business as a Texas corporation with its principal place of business located at 1620 West Seale Street, Nacogdoches, Texas, 75964. MJS offers home health providers selected services including, but not limited to, clinical and corporate compliance plan development and audits.

9. During Judy Master's tenure at MJS, she performed Medicare compliance audits for the Defendants. As such, Judy Master has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), derived through her former employment with MJS, of the information on which the allegations set forth in this Complaint are based. Judy Master is the original source of the allegations as defined in 31 U.S.C. § 3730(e)(4)(B). Judy Master has knowledge of the false statements, records and claims that Defendants knowingly falsely and fraudulently submitted to the federal government as alleged herein.

10. Defendant LHC Group, Inc. is a corporation organized under the laws of Delaware with its principal place of business located at 420 West Pinhook Road, Suite A, Lafayette, Louisiana 70503.

11. LHC Group, Inc. began operations as St. Landry Home Health, Inc. in Palmetto,

Louisiana in 1994.

12. St. Landry Home Health, Inc. reorganized and began operating as Louisiana Health Care Group, Inc. in June 2000.

13. Louisiana Health Care Group, Inc. reorganized and became a wholly owned subsidiary of The Healthcare Group, Inc. in March 2001.

14. The Healthcare Group, Inc. merged into LHC Group, LLC, a Louisiana limited liability company, in December 2002.

15. LHC Group, LLC established a wholly owned Delaware subsidiary, LHC Group, Inc., in January 2005.

16. LHC Group, LLC merged into LHC Group, Inc. on February 9, 2005.

17. Defendants Able Home Health, Inc., Alabama Health Care Group, LLC, Clay County Hospital HomeCare, LLC, D. W. McMillan Memorial Hospital, Mizell Memorial Hospital HomeCare, LLC, Thomas Hospital, Thomas Home Health Agency, AHCG Management, LLC, Arkansas Health Care Group, LLC, Arkansas HomeCare of Hot Springs, LLC, Dallas County Medical Center HomeCare, LLC, Eureka Springs Hospital HomeCare, LLC, Eureka Springs Hospital Hospice, LLC, Mena Medical Center Home Health, LLC, Mena Medical Center Hospice, LLC, Southwest Arkansas HomeCare, LLC, Howard Memorial Hospital, LHC Health Care Group of Florida, LLC, Lifeline Home Health Care of Port Charlotte, LLC, Lifeline Home Health Care of Lakeland, LLC, Lifeline Home Health Care of Lady Lake, LLC, Lifeline Home Health Care of Marathon, LLC, Munroe Regional HomeCare, LLC, Floyd HomeCare, LLC, Georgia Health Care Group, LLC, Georgia

18

HomeCare of Harris, LLC, LHC HomeCare, LLC, LHC HomeCare-Lifeline, LLC, Lifeline Home Health Care of Bowling Green, LLC, Lifeline Home Health Care of Somerset, LLC, Lifeline Home Health Care of Russellville, LLC, Lifeline Home Health Care of Lexington, LLC, Lifeline Home Health Care of Hopkinsville, LLC, Lifeline Private Duty Services of Kentucky, LLC, Kentucky Health Care Group, LLC, Acadian HomeCare, LLC, Acadian Home Health Care Services, LLC, Acadian Premiere Regional Nursing, LLC, Baton Rouge HomeCare, LLC, Bienville Medical Center, Diabetes Self-Management Center, Inc., Home Nursing Care, LLC, Hood Home Health Service, LLC, LHC Group Pharmaceutical Services, LLC, LHCG-III, LLC, LHCG-IV, LLC, LHCG-V, LLC, LHCG-VI, LLC, LHCG-VII, LLC, LHCG-VIII, LLC, LHCG-IX, LLC, LHCG-XI, LLC, Louisiana Health Care Group, LLC, Louisiana HomeCare of Delhi, LLC, Louisiana HomeCare of Greater New Orleans, LLC, Louisiana HomeCare of Hammond, LLC, Louisiana HomeCare of Minden, LLC, Louisiana HomeCare of Miss-Lou, LLC, Louisiana HomeCare of North Louisiana, LLC, Louisiana HomeCare of Northwest Louisiana, LLC, Louisiana HomeCare of Slidell, LLC, Louisiana Hospice and Palliative Care, LLC, Louisiana Physical Therapy, LLC, Oak Shadows of Jennings, LLC, Patient's Choice Hospice and Palliative Care of Louisiana, LLC, Richardson Medical Center HomeCare, LLC, St. Francis HomeCare, LLC, St. James HomeCare, LLC, St. Landry Extended Care Hospital, LLC, Thibodeaux, Albro and Touchet Therapy Group, Inc., Tri-Parish Community HomeCare, LLC, Extended Care Hospital of Lafayette, Texas Health Care Group Holdings, LLC, Able Home Health, Inc., Leaf River Home Health Care, LLC, Mississippi Health Care Group, LLC, Mississippi HomeCare, LLC, Mississippi HomeCare of Jackson, LLC, Picayune HomeCare, LLC, North Carolina Health Care Group, LLC, South Carolina Health Care Group, LLC, Lifeline Home Health Care of Union City,

19

LLC, Tennessee Health Care Group, LLC, Extended Care of West Tennessee, University of Tennessee Medical Center, GSHS Home Health, LP, Marshall HomeCare, LP, Red River HomeCare, LLC, Texas Health Care Group, LLC, Texas Health Care Group of Longview, LLC, Texas Health Care Group of Texarkana, LLC, Texas Health Care Group of The Golden Triangle, LLC, HomeCare Plus, Inc., West Virginia Health Care Group, LLC, Princeton Community HomeCare, LLC, Roane General Home Health, LLC, Roane General Hospital, Wetzel County HomeCare, LLC are majority and wholly-owned subsidiaries, equity joint ventures, and/or controlled affiliates of LHC Group, Inc.

18. Upon information and belief, there are additional Defendant John Doe entities that are wholly or majority-owned subsidiaries, equity joint ventures, and/or controlled affiliates of LHC Group, Inc. that have participated in the fraud, but have yet to be identified.

19. LHC Group, Inc. prepares consolidated financial statements for all subsidiaries and entities controlled by it. "Control" is generally defined by LHC Group, Inc. as ownership of a majority of the voting interest of an entity. The consolidated financial statements include entities in which LHC Group, Inc. absorbs a majority of any losses, receives a majority of any residual returns, or both, as a result of ownership, contractual or other financial interests in the entity.

20. Hereafter, for convenience, LHC Group, Inc., its predecessors, wholly and majority-owned subsidiaries, equity joint ventures, and controlled affiliates that operate home-based and/or facility-based service locations will be collectively referred to as LHC Group.

21. LHC Group is a provider of post-acute healthcare services for primarily rural markets in the southern United States. Specifically, LHC Group provides home-based services through its home nursing agencies and hospices and facility-based services through its long-term acute care hospitals and rehabilitation facilities.

22. LHC Group operates in 11 states that include Louisiana, Alabama, Arkansas, Mississippi, Texas, West Virginia, Kentucky, Florida, Georgia, Tennessee, and Ohio.

23. LHC Group:  (a) owns and operates 150 home-based service locations that include 139 home nursing locations, 9 hospices, a diabetes self management company, and a private duty agency; (b) manages 4 home nursing agencies in which it does not have any ownership interest; (c) owns and operates 12 facility-based service locations that include 4 long-term care hospitals with a total of seven locations, an outpatient rehabilitation clinic, a pharmacy, 2 medical equipment companies, and a health club; (d) manages an outpatient rehabilitation facility in which it does not have any ownership interest; and (e) provides contract rehabilitation services to third parties.  A list of LHC Group's home-based and facility-based service locations is attached hereto as Exhibit A.

24. Of the 150 home-based service locations in which LHC Group maintains an ownership interest, 91 are wholly-owned by LHC Group, 52 are majority-owned or controlled by LHC Group through its joint ventures, 2 are cooperative endeavors, and 5 are license lease arrangements.

25. For the years ended December 31, 2006, 2005, and 2004, LHC Group's home-based services provided $164.7 million, $105.6 million and $81.6 million, respectively, of its net service revenue.

21

26. Of the 12 facility-based service locations that LHC Group maintains an ownership interest, 6 are wholly-owned by LHC Group and 6 are majority-owned or controlled by LHC Group through joint ventures.

27. For the years ended December 31, 2006, 2005, and 2004, LHC Group's facility-based services provided $50.5 million, $47.1 million, and $34.5 million, respectively, of LHC Group's net service revenue.

28. Medicare payments accounted for 81.6%, 85.6%, and 86.3%, respectively, of LHC Group's net revenue for the years ended December 31, 2006, 2005, and 2004.

29. Net service revenue for home-based services for the three months ended March 31, 2007 increased 69.8% to $55.1 million compared with $32.4 million for the three months ended March 31, 2006.

30. For the three months ended March 31, 2007, 80.8% of net service revenue was derived from Medicare with home-based services accounting for 78.6% of the revenue.

31. Net service revenue for home-based services for the three months ended September 30, 2007 increased 41.9% to $63.2 million compared with $44.5 million for the three months ended September 30, 2006.

32. For the three months ended September 30, 2007, 82% of net service revenue was derived from Medicare with home-based services accounting for 81.6% of the revenue.

## THE FALSE CLAIMS ACT

33. The False Claims Act ("FCA") provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.  The amount of civil penalties has been increased by amendments, which

currently are set at $5,500 and $11,000 per claim.

## THE MEDICARE PROGRAM[1]

34. In 1965, Congress enacted Title XVIII of the Social Security Act to pay the costs

of certain health care services for eligible individuals.  42 U.S.C. §§ 1395 *et seq.*

---

[1] The other government healthcare programs, such as TRICARE/CHAMPUS, have similar requirements and have similarly been defrauded by the Defendants.  Whenever the term Medicare is used, the allegations also include that other government healthcare programs were similarly defrauded.

35. The Department of Health and Human Services ("HHS") is an instrumentality of the United States whose activities, operations, and contracts are paid from federal funds, and is responsible for the administration and supervision of the Medicare program.

36. Under "Medicare Part A," the United States provides insurance benefits for aged and disabled persons who meet certain requirements. 42 U.S.C. § 1395f(a)(2)(C). Services covered under this benefit include intermittent skilled nursing care, speech-language pathology, physical and occupational therapy, home health aide services, and medical social services. 42 U.S.C. § 1395x(m).

37. Providers of home health care services are typically known as home health care agencies ("HHAs"). HHAs may furnish home health care using their own staff, or, HHAs may contract with others to provide services. In addition, many HHAs are chains that have a central "home office" that provides administrative and centralized management services to individual agencies within the chain.

38. HHAs participating in Medicare are required to complete an Outcome and Assessment Information Set ("OASIS") form, or HCFA or CMS Form 485, whenever a patient specific comprehensive assessment is made for a patient in need of home care services. 42 C.F.R. § 485.55. This form is used to assess the condition and situation of potential patients, as well as to re-assess the condition and situation of existing patients every sixty days. *Id.* In addition to other factors that must be included on the form, HHAs must provide detailed and precise information about patient health, home situation, mobility, and independence. 42 C.F.R. § 485.55.

39. Medicare will pay for home health care services only if the patient is: (a) confined to the home ("homebound"); (b) under the care of a physician; and (c) in need of skilled nursing services on an intermittent basis or physical or speech therapy, or is in need of continued occupational therapy after eligibility for home health services was established by a prior need for one of the other qualifying services. 42 U.S.C. § 1395(f)(a)(2)(C); 42 C.F.R. § 409.42.

40. To be eligible for home health care services, a patient must be considered homebound. That is, the person must have a health condition that restricts his or her ability to leave the home except with the aid of supporting devices, or have a condition that makes leaving the home medically contraindicated (if, for example, leaving the home requires a considerable and taxing effort). 42 U.S.C. § 1395f(a)(2)(C); Medicare Intermediary Manual § 3117.1.

41. To be eligible for home health care services, a patient must require intermittent skilled nursing services, physical therapy, or speech-language pathology services. Continuing occupational therapy services can also provide a basis for eligibility if the patient's initial eligibility was established by a prior need for one of the other qualifying services. In other words, at least one type of skilled service must be medically necessary in order for the patient to be eligible for home health care services. "Skilled services" are sophisticated and complex services that can only be safely and effectively performed by a registered nurse, qualified physical or occupational therapist, or speech-language pathologist. 42 C.F.R. § 409.44; Medicare Intermediary Manual § 3118.

42. Further, to be eligible for home health care services, a physician must also certify the patient's need for home health services. 42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 424.22. In order to be covered by Medicare, the services must be included in a plan of care established by a physician and reviewed and signed by that physician at least once every 60 days. 42 C.F.R. §§ 409.42, 409.43. The plan of care is valid as of the date it is signed, except that services provided from the beginning of a certification period and before the physician signs the plan of care are considered to be provided under the subsequently-signed plan of care where the services were provided pursuant to an adequately-documented oral order, and the services are included in the subsequently-signed plan of care. Medicare Intermediary Manual § 3117.2(E).

43. The HHS reimburses HHAs for the reasonable costs related to Medicare Part A services provided to eligible beneficiaries through private insurance companies that are responsible for determining the amount of the payments to be made to HHAs. 42 U.S.C. §§ 1395f(b), 1395h(a), 1395u(a), 1395x(V); 42 C.F.R. §§ 413.1, 413.5, 413.9.

44. The prospective payment system ("PPS") is the system by which HHAs are reimbursed for service costs.

45. Medicare makes interim payments to HHAs throughout its fiscal year on the basis of the HHAs estimated costs in performing covered home health services. 42 C.F.R. § 413.64. This is known as the periodic interim payment (PIP) or estimated cost method of payment.

46. To receive the interim payments, HHAs are required, as they furnish services, to submit to the Medicare intermediary a HCFA ("UB-92") form. This form identifies the

OASIS data collected in accordance with 42 C.F.R. § 484.55.  42 C.F.R. §§ 484.20, 484.205, 484.250.

47. Also included on the UB-92 form is a Health Insurance Prospective Payment System ("HIPPS") code that reflects the intensity of the patient's condition and level of service that the patient is likely to require.  HHAs determine the proper code to use for a patient by using CMS's software that generates the appropriate HIPPS code from a "Home Health Resources Group" designation that the software assigns the patient. *See* 42 C.F.R. §§ 484.20(d).  The CMS software selects the appropriate "Home Health Resources Group" based, in part, on the information that the HHAs include on the OASIS forms.  Therefore, the encoded OASIS data must accurately reflect the patient's status at the time of assessment.  42 C.F.R. §§ 484.20(b).

48. Medicare's PPS for home health care uses a case mix adjustment that recognizes that different types of patients require different levels of resources, and the data from the OASIS forms is assigned point values based on clinical severity, functional severity, and service utilization.

49. A HHA, when performing the comprehensive assessment of the home health patient's condition, must also list on the OASIS form each diagnosis and corresponding ICD-9-CM code at the level of highest specificity for which the patient is receiving home care.  Each diagnosis and corresponding ICD-9-CM code is sequenced according to the patient's primary diagnosis, other diagnoses, and additional diagnoses.  The primary diagnosis of a patient should coincide with the focus of care of the home health services for that patient.  Medicare reimbursement values are determined, in part, by the primary diagnosis and

corresponding ICD-9-CM code existing for a particular patient – certain codes having a higher reimbursement value than others.

50. Based on the underlying diagnoses and the evaluation of the patient conducted by the HHA on the initial visit, the patient is assigned a Health Insurance Prospective Payment Code that is used to reimburse the HHA for the care they provide. The sicker the patient, generally, the greater the level of reimbursement, as these patients are deemed under the system to require more attention, time, and clinical expertise. HHAs, therefore, have an incentive to upcode their patient's diagnoses and levels of clinical and functional severity, as well as their service utilization, in order to obtain maximum reimbursement.

51. At the end of Medicare's fiscal year, HHAs submit detailed cost reports that reflect the total cost of providing Medicare services, including the HHAs' administrative expenses, less the total interim payments made to the HHAs as a result of the UB-92 forms. It is absolutely necessary that the information reflected on the year-end cost reports be accurate because that information forms the basis for the amount Medicare pays the HHAs for the period covered by the report.

52. The HHS, through its intermediaries, reviews cost reports, cost statements, and other financial representations made by HHAs and home offices, and makes retroactive adjustments to amounts paid to HHAs during the course of the fiscal year. 42 C.F.R. §§ 413.60, 413.64(f). If interim payments exceed actual, reimbursable costs, or the cost limits, pursuant to the cost report and cost statement reconciliation process, Medicare is entitled to a year-end adjustment. *Id.* If a HHA did not actually incur costs that it claimed in a cost report or cost statement and for which it received payment, the agency is in receipt of money which

28

it was not entitled and therefore is obliged to return the money to Medicare.

## BACKGROUND FACTS

53. Judy Master, RN, has worked in the home health care industry for over 25 years. In particular, Judy Master has worked for numerous HHAs where she served as an assistant administrator, director of nurses, assistant director of nurses, and home care aid supervisor. The primary focus of her home health care experience includes, but is not limited to, Medicare compliance and regulatory issues.

54. In her capacity as an RN Compliance Auditor for MJS, Judy Master performed compliance audits of LHC Group's facilities. To perform these audits, MJS travels to each of LHC Group's facilities and scans 10% of all clinical patient records at each LHC Group facility (*i.e.* OASIS forms, plans of care, clinical notes, claim forms, billing forms, *etc.*) onto discs. These scanned documents are then loaded into MJS's system at their on-site location in Nacogdoches, Texas. MJS has developed a software program called the Auditor, whereby compliance auditors review the scanned documents on double monitors: one side with compliance questions generated by the Auditor program and the other side with supporting documentation for each patient. The Auditor program consists of three levels: Level I questions are answered by Level I technicians (not nurses) who are responsible for obtaining any missing information, notes, orders, etc.; Level II questions are generally answered by LVNs (licensed vocational nurses); and Level III questions are answered by RNs. During her tenure at MJS, Judy Master, due to shortness of staff, sometimes reviewed Level I audits and personally performed both Level II and Level III compliance audits of many of LHC Group's home healthcare facilities.

55. At least during the past three years, MJS has been auditing LHC Group's healthcare submissions to government health care programs. Part of the audit included assessing whether LHC Group's requests for government funds had met the government's requirements and whether the claims were reimbursable under government programs. MJS's Auditor Program created audit reports that detailed whether requirements were met and whether particular visits, services, or costs were reimbursable. These audit reports contained columns whereby MJS auditors would place a "No," or the letter "N," a "Yes," or the letter "Y," or "N/A" if not applicable, in one column depending on whether a particular requirement was met or service, visit or cost was reimbursable, and list both standardized and personal comments in additional columns detailing the reasons why a particular requirement was not met or service was not reimbursable. To draw attention to any services or costs that were not allowable under government healthcare programs, MJS had a practice of creating separate spreadsheets with all "No" responses to specifically identify the areas of LHC Group's non-compliance. As a result of these audits, LHC Group determined that it had a 55% non-reimbursable (non-compliance) rate. This means that a majority of the costs billed to government healthcare programs were not allowable. These audit reports and spreadsheets were provided to the executive staff of LHC Group.

56. During the Relator's audit work of LHC Group, she was told by a co-worker that the executives of LHC Group "woke up" and realized they had an extremely low compliance rate for reimbursement and that, according to MJS's audits, 55% of the total costs LHC Group billed to the government were not allowable.

57. The Relator was told something to the effect that MJS's owner, Jan Spears, had directed the Compliance Manager, Sheri Foster, to go back and make changes to the audit

reports.  MJS employees were instructed on Level II audits to state "Yes" or "Y" to the Auditor question "The Visit Provided Met Reimbursement Standards Specific to the Payor" regardless of whether the homebound status of the patient was not assessed on a particular visit or the overall medical necessity of the visit was in question.  Further, existing "No" or "N" responses to this Auditor question were changed to "Yes" or "Y."

58. The Relator was told that when she would perform an audit at the stage I or II level that she must indicate that the costs are allowable even if she knows that the costs would not be reimbursable based upon her knowledge of the programs. The Relator was upset over this instruction and complained to the company that it would be wrong to give the false impression that the costs were allowable at this stage because each individual claim would not be captured under the Level III audit. In turn, this change would have an overall effect of helping to reduce LHC's non-compliance rate despite the fact that the costs were still not allowable. The Relator decided to quit rather than create such a false impression of the allowability of the costs

59. The Relator was told by the Compliance Manager, Sheri Foster, that the Auditor question "The Visit Provided Met Reimbursement Standards Specific to the Payor" had been answered in audits by MJS over 6,000 times (in 2007 alone) and that MJS auditors had answered this question "No" over 1600 times.  Even after taking out responses to this question for agencies LHC Group was in the process of purchasing as well the Level II responses to this Auditor question that were improperly changed from "No" to "Yes," LHC Group still had a very high non-compliance rate in regards to reimbursement.

60. The Relator believes that the original audit rate of 55% of costs being unallowable is a more accurate measure of the level of unallowable costs. For instance, she found a very high rate of unallowable costs for the audits she conducted. Examples of the false claims and unallowable costs are set forth later in this Complaint.

61. Based upon conversations with MJS employees, Judy Master learned that the fraud by LHC Group was widespread, affecting each of its home healthcare service providers across the entire company and across the entire country where it does business. Examples of statements made by co-workers regarding LHC Group include:

a.    "Some companies," indicating LHC Group, "should not be in the home healthcare business."

b.    Even though a primary diagnosis does not match the primary focus of care for the home health services, LHC Group "keeps the ones that pay the most a lot of the time."

c.    It is obvious LHC Group was "placing home health aides that were not needed."

d.    "Be sure you look at those dates on the plans of care because when they are not signed on time or not signed at all, LHC could get in big trouble for that if they get caught."

e.    LHC Group frequently inquired of the audit company, "which are the money codes?", indicating that they wanted to know which codes billed at higher rates instead of what was the proper code to use.

62. Upon information and belief, LHC Group billed each of the costs identified by the auditors as unallowable to government healthcare programs, including the 55% of unallowable costs identified in the spreadsheets supplied to LHC Group. The process was that LHC Group would ask the outside audit company to review bills that had already been billed to or paid by the government. Upon information and belief, LHC Group did not withdraw any bills or reimburse the government for unallowable costs which it received

payment. Rather, the response of LHC Group to the audits was to ask the audit company to rework the papers to lower the appearance of unallowable costs, but not to withdraw any payment requests, not to repay the government any funds, and not to inform the government of the fact that the outside auditors had determined large portions of the costs were unallowable or that such costs were in fact unallowable.

63. In performing audits of LHC Group, Judy Master obtained direct and independent knowledge of the following specific instances of fraudulent conduct by LHC Group as enumerated below.

## ALLEGATIONS

64. LHC Group knowingly submitted claims for payment which were false or fraudulent in each of the following nine categories: (1) billing for services without a valid plan of care, (2) upcoding ICD-9-CM diagnosis codes, (3) billing for services not rendered, (4) billing for services without physician orders, (5) billing for more services than ordered by a physician, (6) billing for services without the requisite documentation supporting the performance or medical necessity of services billed, (7) billing for services not medically necessary, (8) billing for more time than actually provided, (9) billing for services rendered to patients who were not homebound.

65. LHC Group's fraud was not limited to home healthcare services. LHC Group has a corporate culture which disregards government healthcare program requirements, ignores actual audits detailing that costs are not reimbursable under government healthcare programs, asks its outside auditors to identify the codes that produce the largest reimbursement by government healthcare programs without regard to actual entitlement or allowability, and is

33

interested only in increasing revenue under government healthcare programs.

## LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED THE GOVERNMENT FOR HOME HEALTH SERVICES WITHOUT A VALID PLAN OF CARE

66. Since in or about 1997, and continuing through the present, LHC Group has engaged in a pattern and practice of knowingly falsely and fraudulently billing government healthcare programs for home health services provided without a valid plan of care.  As described in paragraph 37, the physician authorizing the home health services must sign and date the orders that describe the type and duration of services that the patient must receive. The orders are valid as of the date they are signed, except that services provided from the beginning of a certification period and before the physician signs the plan of care are considered to be provided under the subsequently-signed plan of care where the services were provided pursuant to an adequately-documented oral order, and the services are included in the subsequently signed plan of care.   The physician date is necessary to determine when home health services were ordered and the specific date or range of dates that the services were to be rendered.  All orders must be current, signed and dated by the physician prior to billing.

67. LHC Group, for example, billed for all nurse visits to Patient 28[2] made from November 2006 through January 2007 without any physician signature on the plan of care. Similarly, LHC Group billed for 6 skilled nurse visits made from November 2006 through January 2007 to Patient 11 without any physician signature on the plan of care.  Given that

---

[2] Relator has not disclosed the names or other identifiable information with regard to the specific Medicare beneficiaries mentioned in this First Amended Complaint.  This information relating to the beneficiaries is in the possession of Relator's counsel and will be disclosed upon request by this Court and/or the Government.

the plan of care must include a physician signature and signature date and that Medicare does not reimburse home health services without a plan of care that is appropriately signed and dated, the services rendered to Patients 11 and 28 are not reimbursable.

68. Further, LHC Group billed for 4 skilled nurse visits made in October 2006 to Patient 42, nurse visits made from September 2006 through November 2006 to Patient 22, and nurse visits made from October 2006 through November 2006 to Patient 27 all prior to the plans of care being signed by the physician and without documentation of a verbal order to cover the services considered to be provided under the plans of care.

69. In addition, LHC Group billed Medicare for services provided to Patients 4, 18 and 21 prior to the date the physician signed the plan of care. Given that the plan of care must be signed before the bill is submitted to the intermediary for payment, the services rendered to Patients 4, 18 and 21 are not reimbursable.

70. LHC Group billed Medicare for the services described in Paragraphs 61 through 64 herein even though these services were not reimbursable.

### LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY RE-SEQUENCED AND UPCODED ICD-9-CM CODES FOR HOME HEALTH PATIENTS TO OBTAIN HIGHER MEDICARE REIMBURSEMENTS

71. As described in paragraph 44, a HHA is required to perform a comprehensive assessment of the home health patient's condition, which includes listing each diagnosis and corresponding ICD-9-CM code at the level of highest specificity for which the patient is receiving home care. Each diagnosis and corresponding ICD-9-CM code is sequenced according to the patient's primary diagnosis, other diagnoses, and additional diagnoses. The primary diagnosis of a patient should coincide with the focus of care of the home health

services for that patient. Medicare and other federal healthcare programs reimbursement values are determined, in part, by the primary diagnosis and corresponding ICD-9-CM code existing for a particular patient – certain codes having a higher reimbursement value than others.

72. Since in or about 1997, and continuing through the present, LHC Group has engaged in a pattern and practice of knowingly falsely and fraudulently re-sequencing patients' diagnoses and corresponding ICD-9-CM codes without proper authorization, therefore upcoding to obtain higher Medicare reimbursements. For instance, LHC Group re-sequenced the ICD-9-CM codes without proper authorization for Patient 42 listing the primary diagnosis as PVD (peripheral vascular disease) when the primary focus of home health care from October 2006 through December 2006 was aftercare for a right above knee amputation. LHC Group re-sequenced the ICD-9-CM codes without proper authorization for Patient 30 listing the primary diagnosis as rheumatoid arthritis when the primary focus of the resumption of home health care from October 2006 through December 2006 was for a cardiac catheter. Similarly, LHC Group re-sequenced the ICD-9-CM codes without proper authorization for Patient 33 listing the primary diagnosis as sciatica when the primary focus of home health care from November 2006 through December 2006 was aftercare for decubitus (bed sore). LHC Group re-sequenced the ICD-9-CM codes without proper authorization for Patient 9 listing the primary diagnosis as muscle weakness instead of CHF (congestive heart failure). LHC Group also re-sequenced the ICD-9-CM codes without proper authorization for Patient 29 listing the primary diagnosis as spinal stenosis when the primary focus of home health care from November 2006 through December 2006 was aftercare for decubitus (bed sore). Similarly, LHC Group re-sequenced the ICD-9-CM codes

without proper authorization for Patient 41 listing the primary diagnosis as Gout when the primary focus of home health care from November 2006 through January 2007 was for HTN (Hypertension). LHC Group re-sequenced the ICD-9-CM codes without proper authorization for Patient 31 listing the primary diagnosis as CHF (congestive heart failure) when the primary focus of home health care from November 2006 through January 2007 was for anticoagulant problems.

73. Further, LHC Group, for example, re-sequenced the ICD-9-CM codes without proper authorization for Patient 15 listing the primary diagnosis as muscle weakness; for Patient 16 listing the primary diagnosis as arthropathy; for Patient 6 listing the primary diagnosis as atrial fibulation; and for Patient 5 listing abnormality of gait as the primary diagnosis.

74. Similarly, LHC Group re-sequenced the ICD-9-CM codes without proper authorization for Patients 11, 19, 20, 37, 38, and 39 to reflect higher reimbursable codes than supported by the OASIS.

75. Therefore, LHC Group received reimbursements from Medicare greater than what it was entitled to as a result of this upcoding.

## LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED MEDICARE FOR HOME HEALTH SERVICES NOT RENDERED

76. Since in or about 1997, and continuing through the present, LHC Group has engaged in a pattern and practice of knowingly falsely and fraudulently billing Medicare and other government healthcare programs for home health services that were never performed. For example, LHC Group billed for 31 skilled nurse visits to Patient 25 from November 2006

through January 2007 when no skilled service was performed. LHC Group billed for 4 skilled nurse visits to Patient 40 in November and December 2006 when no skilled service was performed. LHC Group billed for 2 skilled nurse visits for Patient 5 in November 2006 and January 2007 when no skilled service was performed. Similarly, LHC Group billed for skilled nurse visits for Patients 2, 10, 21, 35, and 37 when no skilled service was performed.

77. Further, LHC Group billed Medicare for a personal care nurse visit for Patient 15 when no personal care was performed. LHC Group also billed for a home health aid visit to Patient 12 when no personal care or assistance with activities of daily living was performed.

78. In addition, LHC Group billed Medicare for a physical therapy visit to Patient 7 that was missed; a home health aide visit to Patient 10 that was refused; and a skilled nurse visit to Patient 43 that was marked no charge.

79. As such, LHC Group received reimbursements from Medicare that it was not entitled to receive.

### LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED MEDICARE FOR HOME HEALTH SERVICES THAT WERE NOT ORDERED BY A PHYSICIAN

80. Since in or about 1997, and continuing through the present, LHC Group also has engaged in a pattern and practice of knowingly falsely and fraudulently billing Medicare and other government healthcare programs for services that were not authorized by a physician. LHC Group, for example, billed Medicare for wound care provided to Patient 42 from November 2006 through December 2006 without any valid physician's orders. Similarly, in December of 2006, LHC Group billed Medicare for a home health aide visit to Patient 17 without any valid physician's order for that visit.

38

81. LHC Group also knowingly falsely and fraudulently billed Medicare for patient education rendered without an order from the patient's physician.  In October 2006, LHC Group billed Medicare for patient education rendered to Patient 43 not related to the current plan of treatment and without an order from the patient's physician.  Similarly, LHC Group billed Medicare for education rendered to Patient 2 on November 17, 2006 which was not related to the current plan of treatment and without an order from the patient's physician.

82. Further, LHC Group, for instance, billed Medicare for a home care aide visit and a skilled nurse visit in January 2007 rendered to Patient 12 after receiving a "discontinue home health" order from the patient's physician.  Also, in December 2006, LHC Group billed Medicare for a social worker evaluation that was not ordered by the patient's physician.

83. These practices resulted in LHC Group receiving reimbursements from Medicare that it was not entitled to receive.

### LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED MEDICARE FOR MORE HOME HEALTH SERVICES THAN ORDERED BY A PHYSICIAN

84. Since in or about 1997, and continuing through the present, LHC Group has knowingly engaged in a pattern and practice of billing the government for more services than the patient's physician actually ordered.  LHC Group, for example, billed Medicare for a total of 8 skilled nursing visits made to Patient 3 from November 2006 through January 2007 beyond that ordered by the patient's physician and 4 skilled nurse visits made in November 2006 to Patient 10 beyond that ordered by the patient's physician.  Similarly, LHC Group charged Medicare for 12 physical therapy visits which were not ordered by the patient's

physician, but which were rendered to Patient 10 from November 2006 through December 2006. LHC Group also billed Medicare for 13 visits made by a home care aide to Patient 31 from November 2006 through January 2007 which were not ordered by the patient's physician.

85. LHC Group also has knowingly billed Medicare for patient education without a physician's order and provided patient education not related to the plan of care. LHC Group billed Medicare for services rendered to Patient 43 in October 2006 for hypertension education that was not ordered by the patient's physician. Also, LHC Group billed Medicare for services rendered to Patient 2 in November 2006 for medication education which was not ordered by the patient's physician, not related to the plan of care, and no other skills were performed.

86. Further, LHC Group knowingly billed Medicare for skilled nurse visits noted as "no charge" visits because they were beyond that which were ordered by the physician. LHC Group, for example, billed Medicare for skilled nursing visits rendered to Patient 42 on October 27, 2006, October 30, 2006, November 29, 2006, December 6, 2006 and December 22, 2006 when the physician's order only authorized skilled nursing visits for October 28, 2006 and October 29, 2006.

87. As a result, Medicare reimbursed LHC Group monies that LHC Group was not entitled to receive.

**LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED
MEDICARE WITHOUT ADEQUATE DOCUMENTATION
DEMONSTRATING SERVICES WERE RENDERED OR MEDICALLY
NECESSARY**

88. A HHA is not to bill Medicare without adequate documentation demonstrating the

performance and necessity of the services. *See* 42 C.F.R. § 482.56; 32 C.F.R. §§ 199.2(b),

199.7(a), 199.7(b)(3). Despite these requirements, since in or about 1997, and continuing

through the present, LHC Group has engaged in a pattern and practice of routinely billing

Medicare and other government healthcare programs for services without sufficient

documentation illustrating that the services were performed and necessary. LHC Group, for

example, billed Medicare for home care aide visits rendered to Patient 8 from November

2006 through January 2007 without documentation demonstrating the necessity of this care

since the patient's family was reported as providing the care. Similarly, LHC Group has

billed Medicare for skilled nurse visits for Patient 40 while the nursing notes indicate that the

wife was performing dressing changes daily. LHC Group has also billed Medicare for home

care aide visits rendered to Patient 23 from November 2006 through January 2007 despite the

fact that the visit notes indicated that the patient had a willing and able caregiver. LHC

Group billed Medicare for 11 home care aide visits rendered to Patient 24 from October 2006

through June 2006 despite the fact that the visit notes indicated that the family was

performing the care. LHC Group also billed Medicare for 16 home care aide visits rendered

to Patient 29 from November 2006 through December 2006 although the patient was living

in an assisted living facility and had a willing and able caregiver. In October 2006, Medicare

was billed by LHC Group for home care aide visits rendered to Patient 37 while a willing and

able caregiver provided the patient's care. From November 2006 through January 2007,

LHC Group billed Medicare for 8 home care aide visits rendered to Patient 14 while the

41

family caregiver performed the care to the patient. In addition, LHC Group billed Medicare for 13 home care aides visits rendered to Patient 31 from November 2006 through January 2007 with no documentation indicating the need for the services.

89. Further, LHC Group knowingly falsely and fraudulently billed Medicare for home health services and visits without adequate documentation supporting the necessity of the services rendered or that the services were even rendered. For example, LHC Group billed Medicare for 6 skilled nurse visits from December 2006 through January 2007 to Patient 28 after the nursing notes indicated no further need for skilled nurse visits. LHC Group also billed Medicare for a visit on December 1, 2006 rendered to Patient 1 while no documentation could be found to even support that a visit took place.

90. LHC Group also knowingly falsely and fraudulently billed Medicare for reimbursable MO elements (*i.e.* pain, shortness of breath) listed on OASIS forms without adequate documentation after the original evaluation to support that a particular patient actually suffered from these symptoms (a/k/a documentation does not support case mix). For example, the OASIS form for Patient 43 indicated that the patient was incontinent and had pain, but the nursing notes indicated that the patient was continent and pain was not supported throughout the records. Additionally, the OASIS form from November 2006 for Patient 18 indicated that the patient had pain all the time, but the nursing documentation did not support this pain evaluation which stated that there was no pain at this time. In September 2006, the OASIS form for Patient 22 indicated that the patient was short of breath, but the nursing documentation does not support this finding. Similarly, in October 2006, the OASIS form for Patient 27 indicated that the patient had pain, but all of the occupational therapy notes indicated that the patient never had pain. Also, in October 2006,

Patient 33 was evaluated on the OASIS form as having pain, but there were no nursing notes to support this finding; all notes indicated that Patient 33 did not have any pain from October 2006 through December 2006. The OASIS form for Patient 10 indicated that the patient had pain and was short of breath, but again the nursing notes did not support this finding.

91. Similarly, the documentation does not support the case mix of MO elements listed on the OASIS form for the following patients: Patient 24 for services rendered from October 2006 through June 2007; Patient 30 for services rendered from October 2006 through December 2006; Patient 26 for services rendered from November 2006 through January 2007; Patient 36 for services rendered from November 2006 through January 2007; Patient 42 for services rendered from October 2006 through December 2006; and Patient 31 for services rendered from November 2006 through January 2007.

92. Consequently, LHC Group obtained reimbursements from Medicare that LHC Group was not entitled to receive.

### LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED MEDICARE FOR SERVICES THAT WERE NOT REASONABLE OR NECESSARY

93. Since in or about 1997, and continuing through the present, LHC Group has engaged in a pattern and practice of knowingly falsely and fraudulently billing Medicare and other government healthcare programs for services not reasonable or necessary. LHC Group, for example, knowingly falsely and fraudulently billed Medicare for the following visits rendered while a willing and able caregiver was in the home:  11 home care aide visits rendered to Patient 24 from October 2006 through December 2006; 16 home care aide visits rendered to Patient 29 from November 2006 through December 2006 while the patient lived

43

in an assisted living facility; home care aid visits to Patient 23 from November 2006 through January 2007; services rendered to Patient 37 by a home care aide; and home care aide visits to Patient 8 from November 2006 through January 2007 while the patient's daughter provided all personal care.

94. Since in or about 1997, and continuing through the present, LHC Group has engaged in a pattern and practice of knowingly falsely and fraudulently billing Medicare for unreasonable and unnecessary services. For example, LHC Group billed Medicare for education to Patient 32 with regards to home safety on three separate occasions from November 2006 through January 2007 and no other skilled care or instruction was performed.

95. Therefore, LHC Group received reimbursements from Medicare that it was not entitled to receive.

### LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED MEDICARE FOR MORE TIME THAN ACTUALLY PROVIDED TO HOME HEALTH PATIENTS

96. Since in or about 1997, and continuing through the present, LHC Group has engaged in a pattern and practice of knowingly falsely and fraudulently billing Medicare and other government healthcare programs for more units of time for a visit than is supported by the time in and time out notations contained within the clinical notes for a particular patient. This, in turn, inflated LHC Group's cost reports. For example, LHC Group billed Medicare for 4 units (approximately 1 hour) for each physical therapy visit to Patient 10 when the visit notes reflected only 2 units of time (approximately 30 minutes) actually provided for each visit. Similarly, LHC Group billed Medicare for units of time that did not match clinical

notes for Patients 13, 21, and 38.

97. Accordingly, LHC Group was reimbursed amounts from Medicare that LHC Group was not entitled to receive.

### LHC GROUP KNOWINGLY FALSELY AND FRAUDULENTLY BILLED MEDICARE FOR HOME HEALTH SERVICES RENDERED TO NON-HOMEBOUND PATIENTS

98. Since in or about 1997, and continuing through the present, LHC Group has engaged in a pattern and practice of knowingly falsely and fraudulently billing Medicare and other government healthcare programs for home health services rendered to patients who were not homebound and, therefore, were not reimbursable.

99. For instance, LHC Group billed Medicare for home health services rendered from November 2006 through January 2007 to Patient 28 who was not homebound.

100.     These practices resulted in LHC Group obtaining reimbursements from Medicare that it was not entitled to receive.

### COUNT I
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)

101.     Relator incorporates by reference the allegations set forth in paragraphs 1 through 100 as though fully set forth herein.

102.     As set forth above, LHC Group knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1).

103.     By virtue of the false or fraudulent claims made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(2)

104.     Relator incorporates by reference the allegations set forth in paragraphs 1 through 103 as though fully set forth herein.

105.     As set forth above, LHC Group knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(2).

106.     By virtue of the false records or statements made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(7)

107.     Relator incorporates by reference the allegations set forth in paragraphs 1 through 106 as though fully set forth herein.

108.     As set forth above, LHC Group knowingly made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7).

109.     By virtue of the false records or statements made by the Defendants, the

United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against the Defendants and in favor of the Relator and the United States as follows:

1. On the First, Second and Third Causes of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law;

2. That the Relator be awarded the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d);

3. That the Relator be awarded all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d).

4. That the United States and Relator receive all such other relief as may be just and proper.

Respectfully submitted,

Samuel E. Masur
A. Gregory Grimsal
Gordon; Arata, McCollam, Duplantis & Eagan,
LLP
400 E. Kaliste Saloom Road
Suite 4200
Lafayette, Louisiana 70508-8517
Phone: (337) 237-0132
Fax: (337) 237-3451
Email: smasur@gordonarata.com

Gregory M. Utter (*admitted pro hac*)
Joseph M. Callow, Jr. (*admitted pro hac*)
Danielle M. D'Addesa (*admitted pro hac*)
Brian A. Riddell (*admitted pro hac*)
Keating, Muething & Klekamp PLL
One East Fourth St., Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
Email: gutter@kmklaw.com

Joel Hesch (*admitted pro hac*)
Attorney at Law
3540 Ridgecroft Dr.
Lynchburg, VA 24503
Phone: (434) 592-4251

*Attorneys for Relator Judy Master*

48

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 29th day of November, 2007, a copy of the

foregoing First Amended Complaint and First Amended Disclosure Statement were served on

the individuals below by United States Mail, first class postage affixed, at the addresses below:

Hon. Donald Washington
Hon. Alec Alexander
United States Attorney's Office
Western District of Louisiana
800 Lafayette Street, Suite 2200
Lafayette, LA  70501


Hon. Peter D. Keisler
Acting Attorney General of the United States
5111 Main Justice Building
10th & Constitution Ave. N.W.
Washington, DC 20210

Samuel E. Masur

2266775.1